**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| NEW WEST MATERIALS LLC, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| JWR, Inc. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 05cv403 |
| | ) | |
| INTERIOR BOARD OF | ) | |
| LAND APPEALS, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BUREAU OF LAND MANAGEMENT | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

At issue in this Administrative Procedure Act[1] ("APA") suit for review of final agency

action is whether the reservation of "oil, gas, and all other mineral deposits" in the Small Tract

Act of 1938[2] ("STA") encompasses sand and gravel.

**I.**[3]

Because this dispute involves the interpretation of the STA's mineral reservation, a brief

---

[1] *See* 5 U.S.C. § 701 *et seq.*

[2] 52 Stat. 609 (1938), *amended by* 68 Stat. 239 (1954), *repealed by* 90 Stat. 2798 (1976).

[3] The facts recited here are largely undisputed. Where disputes exist, they are noted and, if material, the facts are construed favorably to plaintiff, as required. *See Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

recitation of the STA's history and pertinent provisions is in order at the outset.

The STA, originally passed in 1938, authorized the Secretary of the Interior to sell or lease five acre tracts of public lands,[4] "which the Secretary may classify as chiefly valuable as a home, cabin, camp, health, convalescent, recreational, or business site." STA 52 Stat. 609 (1938). The sales or leases were to be accomplished under "such rules and regulations as [the Secretary] may prescribe." *Id.* In addition, the STA required the patents under which land was sold to contain a reservation to the United States of the "oil, gas, and other mineral deposits, together with the right to prospect for, mine, and remove the same under such regulations as the Secretary may prescribe." *Id.*

When the STA was amended in 1954, the permissible purposes for which the Secretary could sell the land were expanded to include "residence, recreation, business, or community site purposes." 68 Stat. 239. The statute was amended in order to: (i) expand the category of uses for which the Secretary could sell or lease STA land to include community site purposes, such as municipal, religious or educational purposes, (ii) simplify the STA's administration, and (iii) allow the Secretary to dispose of unsurveyed lands through the STA. *New West*, 164 IBLA at 134 (citing H.Rep.No. 2212, 80th Cong. 2nd Sess., June 4 1948, to accompany H.R. 5555, at 2). The STA's mineral reservation was unchanged except for the addition of the word "all" before the words "other mineral deposits." As amended in 1954, therefore, the STA's mineral reservation granted to the United States the "oil, gas and all other mineral deposits" on land sold

---

[4] Under the original version of the STA, the Secretary could dispose of "any vacant, unreserved, surveyed public land, or surveyed public land withdrawn or reserved by the Secretary of the Interior for other purposes, or surveyed lands withdrawn by Executive Orders Numbered 6910 of November 26, 1934, and 6964 of February 5, 1935 . . . ."

or leased pursuant to the STA.

Approximately twenty years after the amendment, in 1976, the STA was repealed when Congress passed the Federal Land Policy and Management Act of 1976 ("FLPMA"). Importantly, however, the FLPMA expressly preserved the rights of the United States under the STA's mineral reservation provision. *See* 43 U.S.C. § 1701 (2005).

The current dispute involves an 82 acre tract of land ("subject land") conveyed by the United States in 1959 via patent deeds to several private owners in separate parcels approximately five acres in size. Pursuant to the STA the patent deeds reserved the mineral rights to the United States.[5] At the time of the conveyance, the subject land was essentially desert and it remained in this state and vacant for roughly forty years when, in August 2000, plaintiff JWR, Inc. ("JWR") acquired the individual parcels comprising the subject land from private owners.

The subject land is located in Maricopa County, Arizona, approximately 20 miles from downtown Phoenix, and extends along the Agua Fria River channel. River channels constitute an important source for aggregate materials such as sand and gravel because the sand and gravel is typically cleaner and less cemented. Accordingly, and in light of the continued expansion of metropolitan Phoenix, JWR entered into a lease agreement with plaintiff New West Materials ("New West") in October 2000 for the express purpose of New West's extraction of sand and

---

[5] *See, e.g.,* Patent number 1196673 to Wilbur C. Bayham, June 23, 1959 (Administrative Record Vol. 1-5) ("Excepting and reserving, also, to the United States all oil, gas and other mineral deposits, in the land so patented together with the right to prospect for, mine, and remove the same according to the provisions of said Act of June 1, 1938.").

gravel from the subject lands.[6]  The record reflects that New West's subsequent mining operation

has extracted over 2.5 million tons of sand and gravel from two large mining pits, which are 20

to 28 feet deep, and cover an area of 268,000 square feet or roughly six and one half acres.

On November 1, 2001, defendant Bureau of Land Management ("BLM"), an agency of

the U.S. Department of the Interior ("DOI"), asserted ownership on behalf of the United States of

the sand and gravel found on the subject land by virtue of the mineral reservation clause of the

STA and the patent deed.  According to the BLM, New West was not authorized to remove the

sand and gravel without the approval of the DOI and an associated BLM material sales contract.

In addition to the mineral reservation clause of the STA, the BLM based its notice on the

statutory authority of the DOI Secretary,[7] and DOI regulations which forbid the removal of

materials from "public lands" except as permitted by the DOI.[8]  The BLM's interpretation of the

mineral reservation was informed by the Supreme Court's decision in *Watt v. Western Nuclear,

Inc.*, 462 U.S. 36 (1983), which interpreted a similar reservation of "all coals and other minerals"

in the Stock-Raising Homestead Act of 1916 ("SRHA"), 39 Stat. 862, *repealed by* 90 Stat. 2744

(1976), to include gravel.

---

[6] New West's interest in the JWR lease was subsequently purchased by CalMat Co., dba Vulcan Materials Company, Western Division, in February 2005.

[7] 43 U.S.C. § 1201 ("The Secretary of the Interior, or such officer as he may designate, is authorized to enforce and carry into execution, by appropriate regulations, every part of the provisions of Title 32 of the Revised Statutes not otherwise specially provided for.").

[8] *See e.g.* 43 C.F.R. § 9239.0-7 ("The extraction, severance, injury, or removal of timber or other vegetative resources or mineral materials from public lands under the jurisdiction of the Department of the Interior, except when authorized by law and the regulations of the Department, is an act of trespass. Trespassers will be liable in damages to the United States, and will be subject to prosecution for such unlawful acts.").

On November 21, 2001, New West responded to the BLM's trespass notice, noting its disagreement with the BLM's interpretation of the STA and asserting its right to continue extracting sand and gravel from the subject lands.  On January 3, 2002, the BLM issued a notice of trespass to New West and JWR for the unauthorized removal of the sand and gravel.  This notice of trespass stated that the alleged trespass was non-willful.  On February 1, 2002 New West and JWR appealed the BLM's trespass determination to the defendant Interior Board of Land Appeals ("IBLA") pursuant to the regulations set forth in 43 C.F.R. § 4.411.[9]  Throughout 2002, the parties filed briefs contesting the legal issue before the IBLA.[10]

While the appeal to the IBLA was pending, the Supreme Court issued its opinion in *BedRoc Ltd. LLC v. United States*, 541 U.S. 176 (2004), interpreting a reservation of "all the coal and other valuable minerals in the lands so entered and patented" contained in the Pittman Underground Water Act of 1919[11] ("Pittman Act") as not encompassing sand and gravel.  Central to the Supreme Court's decision was the fact that the reservation applied only to "valuable" minerals, which, according to the Court, did not include sand and gravel at the time the Pittman Act was passed.  *Bedrock*, 541 U.S. at 184.  Thereafter, on May 4, 2004, the IBLA requested supplemental briefing from the parties discussing the Supreme Court's decision pursuant to its

---

[9] New West and JWR also filed a concurrent Petition to Stay the BLM's decision pursuant to 43 C.F.R. § 4.21(b).  On April 24, 2002, the stay was granted on the condition that New West file a verified accounting and post a bond.  The terms of the stay and New West's compliance became a disputed issue during the pendency of the appeal.

[10]  On March 27, 2002 the BLM responded to New West's statement of reasons, to which New West replied on April 19, 2002.  On July 3, 2002 the BLM filed a response with several arguments in support of its interpretation that the STA's reservation included sand and gravel.

[11]  41 Stat. 293, *repealed by* 78 Stat. 389 (1964)

authority under 43 C.F.R. 4.1.  The parties submitted their initial briefs in June 2003 and their

responses in July 2003.

On December 2, 2004, the IBLA upheld the BLM's trespass determination in a written

decision in *New West Materials*, 164 IBLA 126 (2004).  In doing so, a majority of the three

administrative judge panel relied on five primary arguments: (i) inferences drawn from the DOI's

contemporaneous regulations governing the disposition of the minerals contained in the STA, *Id.*

at 130-32, (ii) the amendment of the mineral reservation in 1954 to include the modifier "all," *Id.*

at 133-34, (iii) the similarities between the STA's reservation and the mineral reservation of the

Stock-Raising Homestead Act of 1916, construed by the Supreme Court in *Watt v. Western*

*Nuclear*, 462 U.S. 36 (1983), as encompassing gravel, *Id.* at 135, (iv) the protection afforded to

the surface estate owners by the DOI regulations, *Id.* at 136, and (v) the "established rule that

land grants are construed favorably to the Government."  *Id.* (quoting *United States v. Union*

*Pacific R. Co.*, 353 U.S. 112, 116 (1957)).  The third administrative judge dissented, chiefly on

the ground that a reservation of sand and gravel on the five acre tracts envisioned by the STA

would destroy the surface estate, and deprive the surface estate owner of the substance of his

bargain without compensation.  *Id.* at 143-45.  The dissent also argued that the presumption in

favor of the United States does not apply where, as in the case of the STA, the land is transferred

by sale or lease and not by grant.  *Id.* at 147.

On January 28, 2005 New West filed a motion for reconsideration pursuant to 43 C.F.R.

§ 4.403, arguing that because this was an issue of first impression, and given the decision's

significant impact on public land law more generally, "extraordinary circumstances" existed

warranting reconsideration.[12]   The IBLA denied New West's petition for reconsideration in March 2005, explaining that New West had misread both the STA and the IBLA's decision, and that New West had not shown the "extraordinary circumstances" necessary to warrant reconsideration.  The dissenting administrative judge noted that the Petition for Reconsideration had raised new arguments that ought to be addressed, and reaffirmed his position that the panel had decided the issue incorrectly in the first instance.  Both the initial decision of IBLA upholding the BLM's trespass determination, as well as the denial of New West's petition for reconsideration constitute final agency action pursuant to 5 U.S.C. § 704.

Having exhausted its avenues for relief with the agency, New West filed the present suit on April 11, 2005, seeking judicial review of the IBLA's decision and a declaration that the IBLA's decision is arbitrary and contrary to law pursuant to the Court's authority under 5 U.S.C. § 706(a)(2).  Additionally, New West seeks a further declaration that the United States, acting through the BLM, has no ownership interest in the sand and gravel of the subject lands, and an injunction enjoining the BLM from asserting a claim of trespass and resulting damages against New West and JWR.

The parties, recognizing that the material facts in this case are essentially undisputed, have filed cross-motions for summary judgment pursuant to Rule 56(c), Fed. R. Civ. P.  The motions have been fully briefed and argued, and are now ripe for disposition.

---

[12] 43 C.F.R. § 4.403 provides in pertinent part, that: "The Board may reconsider a decision in extraordinary circumstances for sufficient reason."

## II.

Principles governing summary judgment are well-established.  A party's motion for summary judgment should be granted if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Rule 56(c), Fed. R. Civ. P.  In determining whether to grant a party's motion, a court must assess the evidence offered by both parties and  "determine whether there is a genuine issue for trial" after resolving all factual disputes in the non-moving party's favor.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).   To defeat a summary judgment motion, the non-moving party may not rest upon mere allegations or denials, but must "set forth specific facts showing that there is a genuine issue for trial."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Summary judgment is especially appropriate in actions brought under the APA for judicial review, where "the focal point . . . should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

## III.

### A. Scope of Review & Deference

This is a suit to review a final agency action under 5 U.S.C. § 706, and therefore the IBLA's decision must be upheld unless it is determined that the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[13]  As the facts of this case are

---

[13] Section 706 provides, in pertinent part, as follows:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall—
>
> . . .

essentially undisputed, the question presented is whether the agency's interpretation that the

STA's reservation of the "oil, gas, and all other mineral deposits" includes common sand and

gravel passes muster under § 706, namely whether it is arbitrary, capricious, or contrary to law.

This is a question of law and judicial review is *de novo*, as the judiciary is the final arbiter of the

law's meaning.  *See Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837,

842-43 (1984).  Yet, because the agency decision under review is the agency's interpretation of a

statute Congress arguably intended and anticipated would be elucidated by the agency, a

threshold question to be addressed is whether the agency's decision is entitled to any degree of

deference and, if so, the nature and degree of the appropriate deference.

 The doctrine of deferential judicial review of an agency's interpretation of its own statute

is well-established.  *See Id.*; Louis L. Jaffe, *Judicial Control of Administrative Action*, 589-90

(1965) ("I have suggested that normally the courts should tolerate agency law making which does

not in the courts' opinion seem clearly contrary to the statutory purposes as the courts understand

them.").  The doctrine is rooted in the sensible notion that when Congress confers authority on an

agency to apply a statute, it is appropriate to infer from that Congressional grant of authority that

Congress "would expect the agency to be able to speak with the force of law when it addresses

ambiguity in the statute . . . ."  *United States v. Mead*, 533 U.S. 218, 230 (2001).  According to

the Supreme Court, in such circumstances, a reviewing court is not free to substitute its judgment

---

   (2) hold unlawful and set aside agency action, findings, and conclusions
found to be—
    (A) arbitrary, capricious, an abuse of discretion, or otherwise not in
accordance with law . . . .

5 U.S.C. § 706(2)(A).

for that of the agency, "but is obliged to accept the agency's position if Congress has not

previously spoken to the point at issue and the agency's interpretation is reasonable." *Id.* And

importantly, the Supreme Court has also made clear that this deference extends to the resolution

of statutory ambiguities which, as here, were arrived at through formal adjudication.[14] From

these principles and authorities it follows that the IBLA's interpretation of the STA's mineral

reservation merits deference if the proceeding was sufficiently formal to ensure the "fairness and

deliberation that should underlie a pronouncement" of law. *Mead*, 533 U.S. at 230.

The STA specifically grants to the Secretary of the Interior authority over the disposition

of the mineral estates reserved to the United States.[15] In addition, Congress has granted to the

---

[14] See *SEC v. Zandford*, 535 U.S. 813, 819-20 (2002) (holding that the SEC's interpretation of the Securities and Exchange Act in the context of formal adjudication is entitled to deference if it is reasonable); *Mead*, 533 U.S. at 230 n.12 (citing *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999) (applying *Chevron* deference to a decision of the Board of Immigration Appeals); *Federal Employees v. Department of Interior*, 526 U.S. 86, 98-99 (1999) (applying *Chevron* deference to Federal Labor Relations Authority's interpretation of the Federal Service Labor-Management Relations Statute); *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 409 (1996) (giving deference to a statutory interpretation of the National Labor Relations Board); *ABF Freight System, Inc. v. NLRB*, 510 U.S. 317, 324 (1994) (same); *National Railroad Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 417-18 (1992) (applying *Chevron* deference to the Interstate Commerce Commission's interpretation of the Rail Passenger Service Act); *Norfolk & Western R. Co. v. Train Dispatchers*, 499 U.S. 117, 128 (1991) (same); *Fort Stewart Schools v. FLRA*, 495 U.S. 641, 644-45 (1990) (applying *Chevron* deference to the Federal Labor Relations Authority's interpretation of the Federal Service Labor-Management Relations Statute); *Department of Treasury, IRS v. FLRA*, 494 U.S. 922, 928 (applying deference to the Federal Labor Relations Authority's interpretation of the Civil Service Reform Act)).

[15] *See* STA, 68 Stat. 239 ("Patents for all tracts purchased under the provisions of this Act shall contain a reservation to the United States of the oil, gas, and all other mineral deposits, together with the right to prospect for, mine and remove the same under applicable law and such regulations as the Secretary may prescribe.").

Secretary of the Interior general authority to enforce the terms of mineral reservations.[16]  Pursuant

to this authority, the Secretary has promulgated regulations delegating to the IBLA the authority

to decide appeals of decisions of the Bureau of Land Management concerning "the use and

disposition of public lands and their resources" and "the use and disposition of mineral resources

in certain acquired lands of the United States."  43 C.F.R. § 4.1(b)(3).  A party who is adversely

affected by a decision of the BLM may generally appeal that decision to the IBLA under 43

C.F.R. 4.410, and is then entitled to formal procedures set forth in the regulations, which, as the

record indicates, ensure an adequate opportunity to present legal arguments.[17]  Because Congress

has conferred on the DOI the authority to implement the statute in question, and because the DOI

has done so pursuant to a formal adjudicative process, its interpretation of the STA must be

upheld if it is reasonable.

This conclusion finds firm support in Supreme Court decisions indicating that the IBLA's

interpretations of statutes administered by the DOI are due deference on judicial review.  *See*

*Andrus v. Idaho*,  445 U.S. 715, 729 (1980) ("[W]e have in other cases accorded a considerable

deference to the responsible agency's construction of the statute which it administers."); *Bedroc*,

541 U.S. at 192 (citing "deference owed to the executive agency that has consistently construed

the mineral reservations in land grant statutes as including sand and gravel.") (Stevens, J.,

dissenting).  While the Fourth Circuit has not directly addressed the deference due to statutory

---

[16]  *See* 43 U.S.C. § 1201 ("The Secretary of the Interior, or such officer as he may designate, is authorized to enforce and carry into execution, by appropriate regulations, every part of the provisions of this title not otherwise specially provided for.").

[17]  *See generally*, 43 C.F.R. 4.400-4.423 (Title 43, Subtitle A, Part 4, Subpart E "Special Rules Applicable to Public Land Hearings and Appeals") and 43 C.F.R. 4.20-4.31 (Title 43, Subtitle A, Part 4, Subpart B "General Rules Relating to Procedure and Practice").

interpretations of the IBLA, other circuits have consistently deferred to the IBLA when its statutory interpretations are reasonable.[18]  It follows, therefore, that where the STA "is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984).

## B. The Interpretation of the STA's Reservation Clause

In determining whether the STA's mineral reservation of the "oil, gas, and all other mineral deposits" may reasonably be construed as including sand and gravel, the "inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *BedRoc*, 541 U.S. at 183.  Here, however, there can be no doubt that the STA is infected with ambiguity stemming from the presence of the word "mineral."  As the Supreme Court has noted, "the word 'minerals' is 'used in so many senses, dependent upon the context, that the ordinary definitions of the dictionary throw but little light upon its signification in a given case.'" *Western Nuclear*, 462 U.S. at 42-43 (quoting *Northern Pacific R. Co. v. Soderberg*, 188 U.S. 526, 530 (1903)).  And, as the Tenth Circuit has observed, even within the context of reservation clauses, the term mineral

----

[18]  *See e.g. American Colloid Co. v. Babbitt*, 145 F.3d 1152, 1154 -55 (10th Cir. 1998) (limiting its review of the IBLA's statutory interpretation to "the question [of] . . . whether the agency's answer is based on a permissible construction of the statute, that is, whether the agency's construction is rational and consistent with the statute."); *Brandt-Erichsen v. U.S. Dept. of Interior, Bureau of Land Mgmt.*, 999 F.2d 1376, 1381 (9th Cir. 1993) ([T]he decisions of the Interior Board of Land Appeals, a part of the Department of the Interior, on the meaning of a 'receipt upon final entry' for purposes of [The Confirmation Statute, 43 U.S.C. § 1165] should be given substantial deference."); *Chevron USA v. United States*, 923 F.2d 830, 834-35 (Fed. Cir. 1991) (deferring to the IBLA's interpretation of Outer Continental Shelf Lands Act); *Lipscomb v. United States*, 906 F.2d 545, 548-49 (11th Cir. 1990) (deferring to the IBLA's interpretation of the Color-of-Title Act, 43 U.S.C. § 1068); *Nevitt v. United States*, 828 F.2d 1405, 1406-07 (9th Cir. 1987) (deferring to the IBLA's interpretation of the cultivation requirement of 43 U.S.C. § 164).

"is not capable of a definition of universal application, but is susceptible to limitation or

expansion according to the intention with which it is used in the particular instrument or statute."

*Bumpus v. United States*, 325 F.2d 264, 266 (10th Cir. 1963).  Given that the term "mineral" as

used in the STA is ambiguous, the issue becomes whether the IBLA's construction of that term

in this case is based on a permissible reading of the STA.  *See Chevron*, 467 U.S. at 843; *Udall v.*

*Tallman*, 380 U.S. 1, 16 (1965).

This is an issue of first impression, but it is not one on which no guidance exists.  Instead,

the Supreme Court has provided substantial guidance through its interpretation of other federal

statutes with similar mineral reservations.  *See BedRoc Ltd. LLC v. United States*, 541 U.S. 176

(2004)*; Watt v. Western Nuclear*, 462 U.S. 36 (1983).  It is instructive that in interpreting the

mineral reservations in the statutes at issue in those cases, the Supreme Court considered (i) the

plain meaning of the respective reservations, (ii) the contemporary legal sources understanding of

the meaning of the word mineral, and (iii) the purpose of the mineral reservation at issue.[19]

Though the meaning of the word "mineral" is ambiguous, the Supreme Court has given

some direction on whether it includes sand and gravel.  Thus, in *Western Nuclear*, 462 U.S. 36

(1983), the Supreme Court interpreted the Stock-Raising Homestead Act's (SRHA) reservation

of "all the coal and minerals" on lands granted pursuant to the SRHA as encompassing deposits

of gravel.  *Western Nuclear,* 462 U.S. at 60.  Over twenty years later, the Supreme Court

interpreted a reservation of "all coal and other valuable minerals" contained in the Pittman Act of

_____

[19]   *See Bedroc*, 541 at 183-87 (relying on the text and the contemporary legal sources to
interpret the Pittman Act's reservation); *Western Nuclear*, 462 U.S. at 50 (relying on the purpose
of Congress's severance of the mineral estate from the surface estate).

1919 as not including sand and gravel.[20]  *Bedroc Ltd., LLC v. U.S.*, 541 U.S. 176, 186 (2003).  In

distinguishing the Pittman Act's reservation from that of the SRHA, the plurality placed heavy

emphasis on the modifier "valuable" contained in the reservation:

> The SRHA's mineral reservation was identical to the Pittman Act's in every
> respect, save one: Whereas the SRHA reserved to the United States "all the coal
> and other minerals," the Pittman Act reserved "all the coal and other *valuable*
> minerals.

*Id.* at 181 (emphasis in original) (citations omitted).  Thus, according to Justice Rehnquist's

plurality *Bedroc* opinion, "the term 'valuable' makes clear that Congress did not intend to

include sand and gravel in the Pittman Act's mineral reservation." *Id.* at 183-84.  The

implication for the interpretation of the STA's mineral reservation is clear: If the existence of the

modifier "valuable" in *Bedroc* was necessary to distinguish the Pittman Act's mineral reservation

from that of the SRHA, the absence of the word 'valuable' in the STA's mineral reservation

compels the conclusion that the *Western Nuclear* holding is persuasive, if not controlling, and,

therefore, the term "mineral deposits" in the STA's reservation includes sand and gravel.  Thus,

the IBLA reasonably concluded that "the language of the section 2 of the Small Tract Act cannot

meaningfully be distinguished from that of section 9 of the SRHA of 1916, and it should be

interpreted in the same way." *New West*, 164 IBLA 126, 135 (2004).  This is strong support for

---

[20] Chief Justice Rehnquist announced the judgment and delivered an opinion, in which
Justices O'Connor, Scalia, and Kennedy joined.  Justice Thomas filed an opinion concurring in
the judgment, in which Justice Breyer joined.  In contrast to the plurality, Justice Thomas did not
think that the modifier 'valuable' was dispositive, but declined to extend the holding of *Western
Nuclear* because he thought it was wrongly decided.  *Bedroc*, 541 U.S. at 187-89 (Thomas J.,
concurring).  Justice Stevens filed a dissenting opinion, in which Justices Souter and Ginsburg
joined.  Justice Stevens likewise did not think the modifier 'valuable' could reasonably
differentiate the reservation of the SRHA from that of the Pittman Act, but thought that the
decision of *Western Nuclear* demanded that the Pittman Act's reservation be interpreted as
including sand and gravel.  *Id.* at 189-92.

the conclusion that the IBLA's construction of the term "mineral deposits" in this case is a

permissible reading of the STA.

Also significant is the 1954 amendment of the STA reservation's original language

reserving "oil, gas and other mineral deposits" to a reservation of "oil, gas and *all* other mineral

deposits." *See New West*, 164 I.D. at 133.  While the addition of the word "all" was not

commented upon by the drafters of the bill, the IBLA found it significant that Senator Watkins

had stated generally that "[t]he language of the existing law has been rewritten throughout for

clarity." *Id.* at 134 (citing *Congressional Record*, 83rd Cong., 2d Sess., 6644 (May 17, 1954).

Legislative history aside, the clear import of the inclusion of the word "all" is that Congress

intended the STA's mineral reservation to be given the broadest interpretation possible.  *See*

*Bedroc*, 541 U.S. at 183 ("The preeminent canon of statutory interpretation requires us to

'presume that the  legislature says in a statute what it means and means what it says.'") (quoting

*Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-54 (1992)).  Thus, the STA's 1954

amendment also supports the IBLA's construction of the STA in this case

Yet additional support for this conclusion is found in the statutory context of the STA,

namely mining laws in general.  The *Bedroc* plurality buttressed its interpretation of the Pittman

Act's reservation by noting that it explicitly cross-referenced the general mining laws.  *Bedroc*,

541 U.S. at 185.  According to the plurality, the implication of this cross-reference was that the

class of minerals reserved by the Pittman Act was the same class of minerals subject to location

under the General Mining Act of 1872 at the time of the Pittman Act's passage.  *Id.*  (citing the

General Mining Act of 1872, 30 U.S.C. § 22).  Shortly before the Pittman Act was passed, the

Secretary of the Interior had held, in *Zimmerman v. Brunson*, 39 L.D. 310, 310 (1910), that sand

and gravel were *not* locatable "valuable mineral deposits" under the General Mining Act. *Bedroc*, 541 U.S. at 185.  It therefore followed that Congress, which was assumed by the Supreme Court to be aware of the *Zimmerman* decision when it passed the Pittman Act, did not consider sand and gravel to be "valuable minerals."  *Id.*

Because the *Zimmerman* opinion was overturned by the Secretary of the Interior in the 1929 decision of *Layman v. Ellis*, 52 L.D. 714 (1929), it is reasonable to conclude that Congress intended to include sand and gravel in the STA's reservation.  In deciding that sand and gravel were locatable minerals under the mining laws, the *Layman* decision noted the increasing commercial value of sand and gravel and cited publications wherein "sand and gravel have uniformly been classed as a mineral resource."  *Layman*, 52 L.D. at 718.  The *Layman* decision also cited U.S. Geological Survey Bulletins which list sand and gravel as "useful minerals" and as "mineral supplies."  *Id.*  Significantly, the *Layman* opinion was the governing law on whether sand and gravel were a "valuable mineral deposit" for purposes of the mining laws when the STA was originally passed in 1938 and when it was amended in 1954.[21]  It follows, therefore, that when Congress passed the STA it did so with the understanding that the STA's reservation of the "oil, gas, and all other mineral deposits" would include sand and gravel.

---

[21]  In 1955 Congress passed the Common Varieties Act of 1955 in which Congress expressly withdrew "common varieties of sand, stone, gravel, pumice and pumicite" from location under the mining laws.  Common Varieties Act, 30 U.S.C. § 611.  The purpose of the Act "was to prevent mining locations on public lands containing these materials being made with a view to ultimately obtaining title to the lands."  *Poverty Flats Land & Cattle Co. v. United States*, 788 F.2d 676, 680 (10th Cir. 1986).  According to the Tenth Circuit, "[t]here was a perceived abuse of the mining laws to so obtain title but to ultimately put the land to other purposes."  *Id.*  Thus, the 1955 Common Varieties Act does not indicate that Congress no longer considered sand and gravel a mineral, but that Congress believed it wise to allow the Secretary of the Interior to dispose of these "mineral materials" under the Materials Act of 1947.  *See United States v. Coleman*, 390 U.S. 599, 604 (1968).

This conclusion is buttressed by the contemporaneous regulations of the DOI implementing the STA. *New West*, 164 I.D. at 130-32.  In 1940, pursuant to the STA's delegation of rulemaking authority, the DOI issued regulations designed to govern the United States' right to "prospect for, mine, and remove" its reservation of "oil, gas and other minerals" on STA land.[22]  The regulations divided the mineral estate into two categories.[23]  The first category included "coal, oil, gas or other minerals subject to the leasing laws" and were to be disposed of in accordance with the mineral leasing laws then in effect.  The mineral leasing laws in effect at the time applied only to coal, phosphate, oil, oil shale, gas, sodium and potassium.  Mineral Lands Leasing Act of 1920, ch. 85, § 1, 41 Stat. 437 (1920), *as amended*, Act of Feb. 7, 1927, ch. 66 § 5, 44 Stat. 1058 (1927) (current version at 30 U.S.C. § 181).  The second category of the regulation included the "other kinds of minerals," which were not subject to disposition.  A

---

[22]  The original regulations provided:

*Minerals*.  Any deposits of coal, oil, gas or other minerals subject to the leasing laws, in the lands patented or leased under the terms of this law, may be disposed of to any qualified person under applicable laws and regulations in force at the time of such disposal.  No provision is made at this time to prospect for, mine, or remove the other kinds of minerals that may be found in such lands, and until rules and regulations have been issued, such reserved deposits will not be subject to prospecting or disposition.

5 Fed. Reg. 2284, 2286 (June 19, 1940) (cited in *New West Materials*, 164 IBLA 126, 130 (2004).

[23]  This division of reserved minerals into two categories, one category subject to disposition under the leasing laws, and one category of minerals not subject to disposition, persisted in subsequent revisions of the regulations which occurred before the lands were patented.  *See* 43 C.F.R. § 257.15, 12 Fed Reg. 3664, 3666 (June 5, 1947); 43 C.F.R. § 257.15(a), 15 Fed. Reg. 6222, 62224 (September 16, 1950), 43 C.F.R. 257.15(a), 19 Fed. Reg. 8835, 9130 (December 23, 1954), 43 C.F.R. § 257.16, 20 Fed. Reg. 365, 368 (January 15, 1955) (cited in *New West*, 164 IBLA at 130-31).

reasonable, though not required inference is that sand and gravel were included in the

regulation's second category of "all other minerals."[24]

Indeed, contemporary IBLA and judicial decisions adopted this inference.  Just after the

1954 amendment and just prior to the issuance of the patents for the subject land, the IBLA

confirmed that "[l]and under lease or patent pursuant to the Small Tract Act is not open to

location under the mining laws" because the regulations provided the sole avenue for the

disposition of a STA mineral estate.  *The Dredge Corp.*, 64 I.D. 368, 368 (1957).  In reviewing

this opinion, the district court interpreted the second category of the regulation as—

> clearly stating that "No provision is made at this time to prospect for, mine, or
> remove the other kinds of minerals (sand and gravel included) that may be found
> in such lands, and until rules and regulation have been issued, such reserved
> deposits will not be subject to prospecting."

*The Dredge Corp. v. Penny*, Civ. No. 475 (D.Nev. 1964) *affirmed by Dredge Corp. v. Penny*, 362

F.2d 889 (9th Cir. 1966).[25]  The inclusion of the parenthetical text in the district court's quotation

of the regulation indicates that sand and gravel were the "other kinds of mineral" the regulation

intended to cover.  Thus, the regulations demonstrate that the DOI's contemporaneous

---

[24] The regulations also serve to undercut the plaintiff's argument, based on the principle of *ejusdem generis*, that the specification of oil and gas in the reservation was intended to limit the class of minerals in the reservation to only valuable minerals.  As reflected in the regulations, the STA's reservation listed oil and gas separately in recognition of the leasing laws which regulated their disposal, and not in order to limit the category of minerals described by the phrase "all other mineral deposits."  *See Western Nuclear*, 462 U.S. at 44 n.5 ("The specific listing of coal in the reservation clause of the SRHA sheds no light on what Congress meant by the term 'minerals.'  There were special reasons for expressly addressing coal that negate any inference that the phrase 'and other minerals' was meant to reserve only substances *ejusdem generis.*").  *See also Millsap v. Andrus*, 717 F.2d 1326, 1329 n.5 (10th Cir. 1983).

[25] The district court's opinion is not reported, but the quotation from its decision is found in *Frank Melluzo*, 72 I.D. 21, 24 (1965) (holding that the STA regulation prevented the location of a mining claim for building stone on STA land).

understanding of the STA's mineral reservation was that it included sand and gravel.

Congress' passage of the Materials Act of 1947, reflects that Congress likely shared the DOI's view that the STA's mineral reservation included sand and gravel.  In that Act, Congress gave the DOI the authority to "dispose of mineral materials (including but not limited to common varieties of the following: sand, stone, gravel, pumice, pumicite, cinders and clay) . . . ." Materials Act of 1947, 30 U.S.C. § 601.  This plain indication of Congress' understanding of whether sand and gravel were minerals occurred just eight years after the STA was originally passed and seven years before the STA's reservation was amended to include the word "all," and therefore buttresses the conclusion that "all other mineral deposits" includes sand and gravel. *See Bedroc*, 541 U.S. at 184 ("[T]he proper inquiry focuses on the ordinary meaning of the reservation at the time Congress enacted it.").

Finally, Congress' purpose in reserving the mineral estate of STA land also supports a conclusion that the IBLA's construction of the STA in this case is reasonable and permissible. As the Supreme Court explained in *Western Nuclear*, "Congress' underlying purpose in severing the surface estate from the mineral estate was to facilitate the concurrent development of both surface and subsurface resources."  *Western Nuclear*, 462 U.S. at 47.  Just as Congress would not have expected the ranchers and farmers who received grants pursuant to the SRHA to exploit the subsurface estate, Congress likewise could not have expected the homeowners or small business owners of five acre plots to exploit the subsurface estates sold or leased pursuant to the STA. *Compare* SRHA, 43 U.S.C. § 292 (authorizing the Secretary to designate lands "chiefly valuable for grazing and raising forage crops") *with* STA, (authorizing the Secretary to designate land "chiefly valuable for residence, recreation, business or community site purposes").  Thus, in

addition to the text of the reservation and the contemporary legal understanding of the word

"minerals," Congress' purpose in reserving the mineral estate supports the IBLA's construction

of the STA's reservation.

Plaintiffs resist this conclusion by arguing that because the subject land was made up

largely of sand and gravel, Congress could not have intended to include sand and gravel in the

phrase "all other mineral deposits" lest the reservation swallow up the surface estate.  *See*

*Bedroc*, 541 U.S. at 182 n.4 (quoting *Western Nuclear*, 461 U.S. at 71-72 (Powell, J.,

dissenting)).  *See also*, *Farrell v. Sayre*, 270 P.2d 190, 192-93 (Colo. 1954) ("[T]he word

'minerals' when found in a reservation out of a grant of land means substances exceptional in

use, in value, and in character and does not mean the ordinary soil of the district which if

reserved would practically swallow up the grant.").  The well-recognized principle that a

reservation of minerals does not include sand and gravel if they comprise a significant part of the

soil is appropriate in the context of private transactions involving a specific piece of land with a

definite soil composition.[26]  Courts sensibly assume that the parties in such private transactions

did not intend to reserve a significant part of the surface estate in the mineral reservation.  But

such private transactions stand in sharp contrast to the purpose and content of the STA.  When

Congress passed (and later amended) the STA it did not have a specific piece of land in mind,

but public lands generally across the country.[27]  In amending the STA, Congress made clear that

---

[26]  *See, e.g., Clay, Sand, or Gravel as "Minerals" Within Deed, Lease, or License*, 95
A.L.R.2d 843 § 5 (citing *Psenick v. Wessels*, 205 SW2d 658 (Tex. Civ. App. 1947); *West
Virginia Dept. of Highways v. Farmer*, 226 S.E.2d 717 (W.Va. 1976)).

[27]  *See* STA, 68 Stat. 240, § 1 (allowing the Secretary of the Interior to designate as STA
land "any vacant, unreserved public lands"), § 4 (creating special provisions for the sale or lease
of STA land to DOI employees stationed in Alaska), § 5 (extending the act to former railroad

it intended to reserve "all other mineral deposits" in public lands across the country, and while some of the surface estates sold or leased pursuant to the STA may have been comprised largely of sand and gravel, others certainly were not.  Because it is unlikely that Congress intended the meaning of the STA's mineral reservation to change depending on the soil composition of the particular five acre tract at issue, the general principle that a mineral reservation does not include sand and gravel if they comprise a significant part of the soil loses its force.

Nor is it persuasive to argue, as plaintiffs do, that the IBLA's reading of the STA is unreasonable because including sand and gravel in the mineral reservation would allow disruption of the surface estate should the United States choose to exploit its mineral estate by the extraction of sand and gravel.  This argument overlooks the fact that virtually any type of drilling or mining operation to exploit the mineral estate is likely to disrupt the five acres comprising a STA surface estate.  Thus, the potential disruption of the surface estate provides no basis for attacking the reasonableness of the IBLA construction of the STA.

Along the same line, plaintiffs also argue that while it is reasonable to assume that STA parcel purchasers accepted the risk to the surface estate of oil and gas exploitation, it is not reasonable to make the same assumption regarding sand and gravel.  This is so, plaintiffs argue, because the STA parcels in the area in issue are composed chiefly of sand and gravel.  But this argument is also unpersuasive; it confuses the prevalence of sand and gravel with the risk that it would be exploited.  As the record reflects, there was no significant local market for sand and gravel in the Arizona desert in 1959, and therefore, it follows that the risk of sand and gravel mining is not likely to have concerned the original STA parcel purchasers any more than the risk

grants in Oregon).

of oil or gas exploration.  When the surface estate was purchased by various patentees in 1959, and again when it was purchased by JWR, the purchasers accepted the risk that the United States might choose to exploit its mineral estate, which included not only the uncommon and valuable minerals of oil and gas, but the common and relatively less valuable minerals of sand and gravel. This risk was presumably captured by a reduction in the land's price.  *See* James L. Huffman, *The Allocative Impact of Mineral Severance: Implications for the Regulation of Surface Mining*, 22 Nat. Resources J. 201, 203 (1982).  It is worth noting in this regard, only because it is relevant to the risk of surface estate destruction by the reservation of sand and gravel, that the sand and gravel mining operation at issue in the present case was not begun by permission of the United States as the owner of the mineral estate, but by the lessor of the surface estate.  Thus, it is not unreasonable to assume that Congress would expect the purchasers to accept the risk of sand and gravel exploitation on their land.

Plaintiffs also fail to consider the disruption to the United States' mineral estate that results from the plaintiffs' operation of a sand and gravel mining operation of 28 foot pits spread over roughly six and one half acres.  It would be quite difficult to sustain an oil drilling or mining operation simultaneous with a sand and gravel mining operation of this magnitude.  As common sense indicates, "the word 'mineral' is evidently derived from 'mine' as being that which is usually obtained from a mine."  *See Mines and Minerals*, 58 CJ2d § 4(a) (1998) (citing *Brady v. Smith*, 73 N.E. 963 (N.Y. 1905)).  Thus, it is reasonable to assume that when Congress reserved to itself the "oil, gas and all other mineral deposits" on STA land, it intended any large scale

mining operation would take place only with the government's permission.[28]

Nor is the IBLA's construction of the mineral reservation defeated by plaintiffs' argument that the STA's lack of a provision providing for compensation to the surface estate owner for damage caused by exploitation of the mineral estate reflects congressional intent not to include sand and gravel in the mineral estate. In *Western Nuclear*, the Supreme Court noted that because the SRHA specifically allowed mineral prospectors access to the mineral estate of SRHA land, it also included a provision protecting the interests of the surface estate owners by providing for compensation should the exploitation of the subsurface estate by mineral prospectors damage the surface estate. *Western Nuclear*, 462 U.S. at 51 n.11. Plaintiffs contend that the absence of a similar provision in the STA indicates an intent not to reserve sand and gravel, lest the surface estate owners be left without a remedy for the damage done to the surface estate by exploitation of the mineral estate. This argument overstates the significance of this difference between the two statutes. A provision for compensation to the surface estate owners was not necessary in the STA because Congress did not provide a specific right for prospectors to enter upon the land. Instead, Congress entrusted to the DOI the authority to manage potential conflicts between the rights of the surface estate owners and those exploiting the United States' mineral estate.[29] As

---

[28] While the disruption to the mineral estate of a six and one half acre, 28 foot deep mining operation is obvious, the question arises whether the reservation of mineral rights would preclude a surface estate owner from using a relatively minor amount of sand and gravel for non-commercial purposes. Presented with this hypothetical situation, government counsel said that use would still amount to a trespass, but the DOI would almost certainly raise no objection to it.

[29] 69 Stat. 239 ("Patents for all tracts purchased under the provisions of this Act shall contain a reservation to the United States of the oil, gas, and all other mineral deposits, together with the right to prospect for, mine, and remove the same under applicable law and such regulations as the Secretary may prescribe.").

already noted, the DOI's regulations, in force between 1940 and 1980, provided for the

exploitation of only those materials subject to the mineral leasing laws, and made no provision

for the exploitation of other kinds of minerals.[30]  When the STA was repealed by the passage of

the FLPMA, the regulations promulgated pursuant to the STA's delegation were rescinded,[31] and

the disposal of any minerals contained in a STA reservation, which were specifically preserved

by the FLPMA,[32] became subject, by default, to disposition under the Materials Act of 1947.[33]

---

[30]  *See supra* notes 22-24 and accompanying text.

[31] *See* 51 Fed. Reg. 3599 (January 29, 1986); 45 Fed. Reg. 39416, 39420 (June 10, 1980).

[32] FLPMA § 701(a), 43 U.S.C. § 1701(a) ("Nothing in this Act shall be construed as terminating any valid lease, permit, patent, right of way or other land use authorization existing on the date of approval."); FLPMA § 701(c), 43 U.S.C. § 1701(c) ("All withdrawals, reservations, classifications, and designations in effect as of the date of approval of this Act shall remain in full force and effect until modified under the provisions of this Act or other applicable law.").

[33] The Materials Act provides:

> The Secretary, under such rules and regulation as he may prescribe, may dispose of mineral materials (including but not limited to common varieties of the following: sand, stone, gravel, pumice, pumicite, cinders and clay) . . . on public lands of the United States . . . if the disposal of such mineral . . . (1) is not otherwise expressly authorized by law, . . . and (2) is not expressly prohibited by laws of the United States, and (3) would not be detrimental to the public interest. Such material may be disposed of only in accordance with the provisions of the Act and upon payment of adequate compensation therefore, to be determined by the Secretary.

Materials Act of 1947, 30 U.S.C. § 601.  The DOI's position is that "public lands" includes mineral estates reserved to the United States.  *See* Final Rule: Mineral Materials Disposal:

> One comment stated that it should be made clear in the definition of "public lands" that "any lands and interest in lands" includes the mineral estate. The definition we used in the proposed rule is the standard definition, derived from the Federal Land Policy and Management Act of 1976 (FLPMA), which certainly intends to include the mineral estate. The public generally understands this.

30 U.S.C. § 601.  And pursuant to that act, the DOI has promulgated regulations governing disposition of minerals contained in United States mineral reservations, which authorize the use of sales contracts to dispose of mineral materials subject to the Act.[34]  To date, the BLM in Phoenix has exercised its discretion under the regulations to dispose of mineral materials such as sand and gravel on STA land, but only in situations where the surface estate owner is the party attempting to mine the subsurface estate.[35]  Thus, as demonstrated by 67 years of experience, it is reasonable to conclude that  Congress intended to entrust the DOI with protecting the interests of the surface estate owners from damage resulting from sand and gravel mining, and therefore, the absence of a specific provision compensating surface estate owners for damage to their land is not persuasive evidence that the mineral reservation did not include sand and gravel.

---

66 Fed. Reg. 58892, 58892.

[34] *See* 43 C.F.R. 3600 et seq.

[35] *See* Garrett Declaration ¶ 8 (Exhibits to Plaintiffs' Memorandum of Points and Authorities in Support of Their Motion for Summary Judgment, Exhibit 13).

Finally, plaintiffs cite a number of other federal[36] and state[37] cases interpreting the mineral

reservations included in other statutes and private agreements as not including sand and gravel.

These citations, however, cannot overcome the clear implication of the Supreme Court's

decisions in *Western Nuclear* and *Bedroc*, which, unlike the decisions cited by plaintiff, are

binding here.  These Supreme Court decisions interpreting similar mineral reservations, together

with the evidence drawn from contemporary legal sources, convincingly demonstrates that the

IBLA's interpretation is a "permissible construction." *Chevron*, 467 U.S. at 843.  For these

reasons, the plaintiffs' motion for summary judgment must be denied and the defendants' motion

---

[36] *See, e.g., United States v. Hess*, 348 F.3d 1237 (10th Cir. 2003) (holding that sand and gravel was not included in a reservation of "all minerals . . . including oil and gas" contained in the Indian Reorganization Act of 1934); *Burkey v. United States*, 25 Cl. Ct. 566 (U.S. Cl. Ct. 1992) (holding that a reservation of "all gas, oil and minerals" within a property grant to the United States did not include sand and gravel); *Poverty Flats Land and Cattle Co. v. United States*, 788 F.2d 676, 681 (10th Cir. 1986) (holding that caliche rock was not included in the Taylor Grazing Act's reservation of "all mineral deposits."); *Cumberland Mineral Co. v. United States*, 513 F.2d 1399, 1402 (U.S. Cl. Ct. 1976) (holding that a private party did not reserve sandstone and clay in a grant to the United States as part of its reservation of "the mineral, oil, and gas" of the land.); *Bumpus v. United States*; 325 F.2d 264, 267 (10th Cir. 1963) (holding that a reservation of "oil, gas and other minerals" in land taken by the United States did not include gravel).

[37] *See, e.g., Miller Land and Mineral Co. v. State Hwy. Comm'n of Wyoming*, 757 P.2d 1001, 1003 (Wyo. 1988) (holding that a private reservation of all "mineral[s] and mineral rights" does not include gravel); *Rysavy v. Novotny*, 401 N.W.2d 540, 542-43 (S.D. 1987) (distinguishing *Western Nuclear* and holding that a reservation of "one/half (½) of all the mineral rights" on land does not include extraction of rock when to do so would destroy the surface estate); *W.Va. Dept. of Highways v. Farmer*, 226 S.E.2d 717 (W.Va. 1976) (holding that a reservation of the "oil, gas and other minerals" did not include sand and gravel); *Elkhorn City Land Co. v. Elkhorn City*, 459 S.W.2d 762 (Ky. 1970) (holding that a reservation of the "coal, oil, gas and minerals and mineral substances" did not include sand clay loam and sandy shale); *Fisher v. Keweenaw Land Ass'n*, 124 N.W.2d 784 (Mich. 1963) (holding that a reservation of "ores and minerals" did not include sand and gravel); *Witherspoon v. Campbell*, 69 So.2d 384 (Miss. 1954) (holding that reservation of "all minerals, both liquid and solid" did not include sand and gravel).

for summary judgment must be granted.  An appropriate Order will issue.


_____/s/_____
Alexandria, VA                                 T. S. Ellis, III
October 28, 2005                              United States District Judge